DAVID ORR *et al.*, Plaintiffs-Appellees, v. JIM EDGAR, Governor, *et al.*, Defendants-Appellants (The City of Chicago *et al.*, Intervening Plaintiffs-Appellees).

First District (6th Division) Nos. 1—96—1613, 1—96—2178, 1—96—3050 cons.

Opinion filed September 26, 1996.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, Mary E. Welsh, Paul Racette, and Marcia L. McCormick, Assistant Attorneys General, of counsel), for appellants.

Michael Kreloff and Keck, Mahin & Cate (David R. Melton, of counsel), both of Chicago, for appellees David Orr and Monica Chavez-Silva.

Cornfield & Feldman, of Chicago (Michael H. Holland, of counsel), for appellees Illinois Federation of Labor and Congress of Industrial Organizations.

Meites, Frackman, Mulder & Burger, of Chicago (Thomas R. Meites and Paul W. Mollica, of counsel), for appellee League of Women Voters of Illinois.

Susan S. Sher, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Jean Dobrer, Assistant Corporation Counsel, of counsel), for appellees City of Chicago, Lorraine Dixon, and Vilma Colom.

PRESIDING JUSTICE ZWICK delivered the opinion of the court:
In these consolidated appeals, we are called upon to review the validity of the two-tier system of voter registration implemented by defendants. For the reasons that follow, we hold that this two-tier system, as implemented by defendants, is violative of state law and infringes upon fundamental constitutional rights.

In granting summary judgment in favor of the plaintiffs, the circuit court held that the two-tier system, which implemented the National Voter Registration Act of 1993 (NVRA) (42 U.S.C. § 1973 *et seq.* (West 1994)), violated certain provisions of both the Illinois Vehicle Code (625 ILCS 5/1—100 *et seq.* (West 1994)) and the State Mandates Act (30 ILCS 805/1 *et seq.* (West 1994)). The court also held that the two-tier system of registration violated both the equal protection clause and article III, section 3, of the Illinois Constitution of 1970, which provides for free and equal elections. In addition, the court ordered local election authorities to treat voters who are registered pursuant to NVRA as properly registered to vote in state and local elections in Illinois.

BACKGROUND
■ Before embarking upon an analysis of the issues presented, it is necessary to review the background of voter registration in Illinois. Under the Illinois Constitution of 1970, the qualifications for voting include United States citizenship, attainment of age 18, permanent residency, and registration. Ill. Const. 1970, art. III, § 1. The General Assembly is vested with the authority to establish registration requirements. Ill. Const. 1970, art. III, § 1. The Illinois State Board of Elections is charged with powers of general supervision over the administration of registration and election laws in Illinois. Ill. Const. 1970, art. III, § 5.

The Illinois Election Code provides that United States citizens who are over the age of 18 years and have been Illinois residents for at least 30 days may register to vote. 10 ILCS 5/4—2, 5—2, 6—27

(West 1994). The Election Code establishes a unitary registration system for voting in all elections, *i.e.*, registration with the local election authority qualifies a voter to vote in all state, federal and local elections. 10 ILCS 5/1—1 *et seq.* (West 1994). Implementation of this unitary system is the responsibility of local election authorities, such as county clerks or commissioners of local boards of election. 10 ILCS 5/4—4, 5—4, 6—21 (West 1994). Among the duties of local election authorities are the appointment, training, certification and supervision of deputy registrars, who conduct voter registration. 10 ILCS 5/4—6.2(b), 5—16.2(b), 6—50.2(b) (West 1994).

The Election Code provides that eligible citizens may register to vote by personally appearing before a deputy registrar by presenting proof of identity and by signing, under oath, a form stating their legal age, residency, and citizenship. Registration may be accomplished by mail in limited circumstances. See 10 ILCS 5/4—4, 4—6.1, 4—6.2, 4—8, 4—10, 5—4, 5—5, 5—6, 5—9, 5—16.1, 5—16.2, 6—29, 6—35, 6—50.1, 6—50.2 (West 1994).

The Election Code requires that the Secretary of State designate a reasonable number of employees at each driver's license facility to serve as deputy registrars. 10 ILCS 5/4—6.2 (West 1994). It also requires that employees of the Department of Public Aid and of certain civic and labor organizations must be appointed on written request. 10 ILCS 5/4—6.2 (West 1994).

In 1990, the Illinois legislature passed an amendment to the Illinois Vehicle Code, which required that "each person" applying for a new or corrected driver's license, identification card, or permit "shall be notified" of the opportunity to register to vote; such notification may be made in writing or verbally by an employee of the Secretary of State. 625 ILCS 5/2—105 (West 1994). In addition, the Secretary of State was obligated to promulgate such rules as may be necessary for the efficient execution of the duties imposed under this amendment. 625 ILCS 5/2—105 (West 1994). Although explicitly required by statute to do so, the Secretary of State failed to issue rules implementing this statute.

In 1993, Congress enacted the National Voter Registration Act (NVRA), which established procedures designed to increase the number of eligible citizens who register to vote in federal elections and to protect the integrity of the electoral process. 42 U.S.C. §§ 1973gg(b)(1), (b)(3) (1994). The provisions of NVRA required that citizens be given the opportunity to register to vote in federal elections simultaneously with their application for a driver's license. NVRA also mandated that each state include a voter registration application form for federal elections as part of an application for a

driver's license. 42 U.S.C. §§ 1973gg—2, 1973gg—3 (1994). In addition, NVRA permitted registration by mail (42 U.S.C. § 1973gg—4 (1994)) and at offices that provide public assistance or state-funded programs primarily engaged in providing services to persons with disabilities (42 U.S.C. § 1973gg—5(a)(2) (1994)), as well as at certain other governmental offices, as designated by the state (42 U.S.C. § 1973gg—5(a)(3) (1994)).

In registering under NVRA, applicants are required to sign, under penalty of perjury, a form setting forth their eligibility to vote, which includes an affirmation as to their age, residency, and citizenship. 42 U.S.C. § 1973gg—3(b) (1994). NVRA permits deputy registrars who are dissatisfied with an applicant's qualifications to forward that applicant's registration card to local election authorities for further verification. A knowing failure to notify authorities of a suspect registration constitutes a federal crime. 42 U.S.C. § 1973gg—10(2)(A) (1994). Although application for NVRA registration may be accomplished by mail, states are authorized to require that first-time voters appear in person to cast their ballot. 42 U.S.C. § 1973gg—4(c) (1994).

The State of Illinois failed to implement procedures to facilitate compliance with the terms of NVRA by the statutory deadline of January 1, 1995. Thereafter, several plaintiffs, including the Association of Community Organizations for Reform Now (ACORN), brought suit against defendants in the Northern District of Illinois for their failure to comply with the terms of NVRA (ACORN litigation). Defendants claimed that NVRA unconstitutionally infringed upon the State's power to govern state and local elections. In August 1995, the United States Court of Appeals for the Seventh Circuit rejected defendants' claim, holding that the passage of NVRA was a proper exercise of congressional power to regulate federal elections. The court issued an injunction commanding defendants to comply with the provisions of NVRA, but ruled that the State may maintain a separate voting registration record for its state and local elections. See *Association of Community Organizations for Reform Now (ACORN) v. Edgar*, 880 F. Supp. 1215 (N.D. Ill. 1995), mod. aff'd, 56 F.3d 791 (7th Cir. 1995).

Defendants subsequently implemented a two-tier system of voter registration, creating dual and separate electorates for state and federal elections. Under this system, persons who register under NVRA provisions are registered to vote in federal elections only. Unless those persons also register a second time to vote in state and local elections, they are restricted on election day to casting ballots for federal offices only.

## THE CIRCUIT COURT LITIGATION

David Orr, the Illinois Federation of Labor and Congress of Industrial Organizations, and Monica Chavez-Silva (collectively, the Orr plaintiffs) challenged the two-tier system, claiming that it violated the notification requirements of the Vehicle Code. 625 ILCS 5/2—105 (West 1994). The Orr plaintiffs also alleged that the two-tier system constituted an unfunded service mandate, in violation of the State Mandates Act (30 ILCS 805/1 *et seq.* (West 1994)).

The League of Women Voters of Illinois (the League) then filed a similar action, asserting, *inter alia*, that the two-tier system violated the equal protection clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 2), as well as the guarantee of free and equal elections (Ill. Const. 1970, art. III, § 3). These two actions were consolidated by the trial court.

Subsequently, the City of Chicago (the City) and two of its aldermen, Lorraine Dixon and Vilma Colom, were permitted to file a complaint as intervening plaintiffs in the consolidated lawsuits. The City and the aldermen joined in the constitutional claims asserted by the League, as well as the Orr plaintiffs' claim that the two-tier system violated the State Mandates Act.

Following denial of defendants' motions to dismiss the complaints, plaintiffs moved for summary judgment on the above claims. On May 1, 1996, after consideration of the pleadings, memoranda of law, arguments of counsel, and admissible portions of several affidavits, the trial court entered summary judgment on each of the above claims in favor of the Orr plaintiffs and the League.

In its order, the trial court held that the Secretary of State violated the notice provisions contained in the Vehicle Code (625 ILCS 5/2—105 (West 1994)) by failing to specifically notify each applicant for a new or renewed driver's license or identification card of his or her right to register to vote in all elections. The court found that the posting of a sign in the driver's license facilities was insufficient and did not satisfy the statute's requirement that "each" applicant be notified. The court also found that the implementation of the two-tier system of registration exacerbated this violation, frustrating the purpose of the Vehicle Code's notice requirement. In ruling, the court specifically noted that "few, if any persons would knowingly limit their voting options at the point of registration." Accordingly, the court ordered the Secretary of State to institute procedures designed to ensure compliance with the notice provision of the Vehicle Code. Specifically, the court found that section 2—105 of the Vehicle Code required the Secretary to provide actual notice to each individual applicant, either orally or in writing, of the opportunity to register to vote in all elections.

In addition, the court held that defendants' adoption of a two-tier system of registration and voting constituted an unfunded mandate in violation of the State Mandates Act. 30 ILCS 805/1 *et seq.* (West 1994). The court observed that the "state government was left to its own judgment as to the mode of implementation" of NVRA and that defendants had selected a form of compliance that was "most costly, most burdensome, [and resulted in the] most disenfranchisement." Consequently, the court determined that unless and until the General Assembly provided the necessary funding, local election authorities had no obligation to implement the two-tier system and could, instead, continue to operate a unitary registration and voting system.

The court also held that defendants' adoption of the two-tier system was a "manifest" classification of the Illinois voting population and violated the "free and equal elections" clause, as well as the equal protection clause of the Illinois Constitution. The court found registration and voting to be fundamental rights and determined that the two-tier system constituted the most restrictive means available of complying with NVRA. The court ordered that all voters registered under NVRA were to be treated in the same manner as other registered voters in Illinois, fully able to participate in state and local elections as well as federal elections.

POST-JUDGMENT LITIGATION

Defendants appealed the trial court's grant of summary judgment, and the Illinois Supreme Court denied defendants' motion for a direct appeal of that ruling. On June 21, 1996, the trial court issued a conditional stay of the summary judgment order. Defendants thereafter appealed the conditional stay, and that appeal was consolidated with the appeal of the May 1, 1996, grant of summary judgment.

On August 22, 1996, the Illinois Supreme Court entered a stay of both trial court orders, pending a decision by this court. On August 28, 1996, pursuant to a motion filed by the City and aldermen, the trial court entered an order which clarified the prior ruling of May 1, 1996. In the August 28, 1996, order the court held that the City and aldermen were entitled to the same relief awarded the other plaintiffs on the claim brought under the State Mandates Act and on their constitutional claims. Accordingly, the trial court ordered that the grant of summary judgment entered May 1, 1996, also applied to the City. Defendants subsequently filed a separate notice of appeal, challenging this order, and that case was consolidated with the two previously filed appeals.

Due to the gravity of the issues presented and the proximity of

the upcoming elections, the briefing schedules and oral arguments in these consolidated appeals were expedited.

## STANDARD OF REVIEW

A motion for summary judgment should be granted when the pleadings, depositions, admissions, and affidavits before the court establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005 (West 1994); *Kolakowski v. Voris*, 83 Ill. 2d 388, 398, 415 N.E.2d 397 (1981). Courts of review consider orders of summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992).

## PLAINTIFFS' VEHICLE CODE CLAIMS

■ We initially address defendants' argument that the trial court erred in ruling that the conduct of the Secretary of State violated the voter-registration notice provisions contained in the Illinois Vehicle Code.

Applicants who present themselves at driver's licensing facilities must, of necessity, deal with an employee of the Secretary's office. Since at least November 1995, as a way of complying with the notification requirements of NVRA, employees at licensing facilities have received a "prompt" on their computer screens telling them to inquire whether the applicant wishes to "register to vote under NVRA," *i.e.*, for federal-only elections. The employee is instructed to ask *only* whether the applicant desires to register to vote under the provisions of NVRA (*i.e.*, for federal-only elections), not whether the applicant wishes to register to vote generally (*i.e.*, for state and local elections as well). It is only if the applicant specifically inquires about voting in all elections that he or she is directed to a deputy registrar, who can then register that applicant to vote in all elections.

Notwithstanding the mandates contained in NVRA, section 2—105 of the Illinois Vehicle Code has, since 1990, required the Secretary to notify "each person" applying for services at a driver's license facility that he or she "may register at such station to vote." 625 ILCS 5/2—105 (West 1994). Notice can be either oral or in writing. Because section 2—105 was enacted before NVRA, it is clear that this provision contemplates that the Secretary will give notice to applicants of their right to register to vote in *all* elections, state and local as well as federal. However, the Secretary of State's only attempt at compliance was to post a sign within the facility which stated, "You may be able to register to vote at this facility. For more

information, please ask at the service counter." In granting summary judgment, the trial court held that section 2—105 requires individualized written or oral notification to each applicant of his or her right to register to vote in all elections. The court rejected the Secretary's position that posting a sign at each licensing facility is sufficient to satisfy the requirements of section 2—105.

The Secretary concedes that NVRA requires that each applicant be given individual notice of the opportunity to register for federal elections by a member of his staff as part of the driver's licensing process. Curiously, however, the Secretary does not interpret the Illinois Vehicle Code, which specifically requires that "each person" be given oral or written notice of his or her opportunity to register to vote, in the same way. The Secretary takes the position that the notice requirements set forth in section 2—105 of the Vehicle Code are satisfied by simply posting a sign in each facility stating "You may be able to register to vote at this facility. For more information, please ask at the service counter." According to the Secretary, such a sign gives "each person" sufficient notice "in writing" of his or her registration rights consistent with the requirements of the Vehicle Code.

It is axiomatic that a statute should be interpreted so as to give meaning to each term or phrase that appears in the statute. *Hirschfield v. Barrett*, 40 Ill. 2d 224, 230, 239 N.E.2d 831 (1968); *Flowers v. City of Moline*, 251 Ill. App. 3d 348, 352, 622 N.E.2d 38 (1993). While the express language of section 2—105 permits notice to be given "in writing," which could arguably be done through the posting of a sign, it also expressly requires that "such notification" be given to "each" applicant. The Secretary's interpretation of section 2—105 as simply requiring the posting of a sign effectively reads the term "each" out of the statutory language.

The word "each" is defined in relevant part as follows:

"A distributive adjective pronoun, which denotes or refers to every one of the persons or things mentioned; every one of two or more persons or things, composing the whole, *separately considered*." (Emphasis added.) Black's Law Dictionary 507 (6th ed. 1990).

Our supreme court has noted that "each" means every one of the two or more individuals composing the whole, considered separately from the rest. *Volunteers of America v. Peirce*, 267 Ill. 406, 415, 108 N.E. 318 (1915); *Auger v. Tatham*, 191 Ill. 296, 300-01, 61 N.E. 77 (1901); *Knickerbocker v. People ex rel. Butz*, 102 Ill. 218, 233 (1882) (Scott, J., dissenting). Thus, when the General Assembly specified that "each" applicant must be notified, it plainly contemplated an individual notice given separately to each applicant. Thus, contrary to

the Secretary's contention, the actual notice requirements contained in section 2—105 do not allow the Secretary to merely give constructive notice by the posting of a sign.

The record indicates that approximately 15,000 voters per month are being registered as "federal only" voters. Most of these voters are being registered at the Secretary of State's driver's license examination facilities. Yet, the Secretary has offered no explanation as to why so many of our citizens would at the time of registration intentionally limit their opportunity to fully participate in state and local elections, or, conversely, would elect to register twice, once for federal-only elections and then again for federal, state and local elections. Logic and reason compel the conclusion that if these citizens had been given meaningful notice of their opportunity to register for all elections when they first approached one of the Secretary's employees, there would be no need to separately register anyone as a "federal only" voter. To put it plainly and directly, few, if any, citizens would consciously choose to wait in two separate lines and make two separate applications in order to register to vote if they were informed, as required under section 2—105 of the Vehicle Code, that the task could be accomplished with a single application. We conclude that the Secretary's interpretation of section 2—105 of the Vehicle Code is incorrect.

STATE MANDATES ACT

■ Defendants also challenge the trial court's ruling that adoption of a two-tier system of registration and voting constituted an unfunded mandate in violation of the State Mandates Act. 30 ILCS 805/1 *et seq.* (West 1994). In support of this challenge, defendants first argue that the trial court lacked jurisdiction to rule on this issue because plaintiffs failed to exhaust their administrative remedies by proceeding before the Department of Commerce and Community Affairs prior to filing suit in the circuit court.[1] We find this argument unpersuasive.

Our supreme court's most recent pronouncement on this issue appears in *Employment Mutual Cos. v. Skilling*, 163 Ill. 2d 284, 644

---

[1]Defendants also assert that the court improperly considered the State Mandates Act claim because it was brought by the Orr plaintiffs, who do not have standing as private parties. We observe, however, that the City of Chicago also asserted this claim and, as a unit of local government, the City has clear standing to allege a violation of the Act. See 30 ILCS 805/3(a) (West 1994). Accordingly, the merits of this claim were properly before the trial court.

N.E.2d 1163 (1994), where a similar argument was rejected. In *Skilling*, the supreme court noted that although Illinois courts have original jurisdiction over all justiciable matters (Ill. Const. 1970, art. VI, § 9), the legislature may vest exclusive original jurisdiction in an administrative agency. *Skilling*, 163 Ill. 2d at 287. However, where a legislative enactment purports to divest the circuit courts of their original jurisdiction through a comprehensive statutory administrative scheme, it must do so explicitly. *Skilling*, 163 Ill. 2d at 287, citing *People v. NL Industries*, 152 Ill. 2d 82, 96-97, 604 N.E.2d 349 (1992).

We have carefully examined the State Mandates Act and find that it contains no language expressly granting the Department of Commerce and Community Affairs (DCCA) exclusive jurisdiction over claims arising thereunder, and it does not divest the circuit courts of jurisdiction to hear such claims. See *Skilling*, 163 Ill. 2d at 287; *NL Industries*, 152 Ill. 2d at 97. Accordingly, concurrent jurisdiction is vested in the circuit courts and in the DCCA.

The doctrine requiring exhaustion of administrative remedies is applicable only where the administrative agency has exclusive jurisdiction to hear the action. See *Skilling*, 163 Ill. 2d at 288; *NL Industries*, 152 Ill. 2d at 95-96. We therefore conclude that the exhaustion doctrine has no relevance in the case at bar, since DCCA and the circuit courts have concurrent jurisdiction.

■ We now examine the merits of plaintiffs' claim brought pursuant to the State Mandates Act (30 ILCS 805/1 *et seq.* (West 1994)). Defendants argue that the trial court erred in finding a violation of this statute because their adoption of the two-tier system of voter registration did not constitute an unfunded state mandate. We disagree.

State mandates include any state-initiated statutory or executive action that requires a local government to establish, expand, or modify its activities, in such a way as to necessitate additional expenditures from local revenues. 30 ILCS 805/3(b) (West 1994). Under this statute, the State is obligated to reimburse local governments for at least 50% of the additional expenses that result from a "service mandate," which is defined as "a State mandate as to creation or expansion of governmental services or delivery standards therefor." 30 ILCS 805/3(f), 6(b) (West 1994). Where the General Assembly fails to make the necessary appropriations allowing reimbursement of expenses for a service mandate, local governments are relieved of the obligation to implement such mandate. 30 ILCS 805/8(a) (West 1994); *Board of Trustees of Community College District No. 508 v. Burris*, 118 Ill. 2d 465, 469, 515 N.E.2d 1244 (1987).

It is undisputed that this two-tier system of voter registration and voting was established by executive action of defendants as a means of complying with NVRA. However, it is also undisputed that nowhere in the provisions of NVRA is there a requirement of a two-tier system of registration. We, therefore, reject any assertion by defendants that the two-tier system was spawned by a federal mandate and was, accordingly, exempt from the State Mandates Act (30 ILCS 805/3(b) (West 1994)).

As the trial court noted, defendants had available to them several different options for effecting compliance with NVRA that would not have resulted in the expansion of governmental services or in additional expenditures from local revenues. In fact, NVRA could have been complied with simply by notifying driver's license applicants that they may register to vote for all elections simultaneously with their application. This is no more than the Secretary of State was already under an obligation to do pursuant to section 2—105. Defendants chose to implement a system that imposed significant additional duties and increased costs upon local election authorities.

It was established in the circuit court that the two-tier system of voter registration adopted by defendants requires local election authorities to devise and maintain two sets of records by preserving information for voters who are registered to vote in federal elections only as well as for voters who are registered to vote in all elections. In addition, local election authorities are obligated to accommodate this dual system by printing two sets of ballots and by maintaining two separate lists of eligible voters at each polling place.

The circuit court found that these additional duties will necessarily increase the costs borne by local election authorities. Defendants now assert that the record does not contain sufficient evidence that additional costs will be imposed. The record does not establish with mathematical precision the exact amount of the additional expenses to be borne by local election authorities. However, the performance of these additional obligations will unquestionably result in increased costs. Indeed, when pressed by the trial judge, defendants conceded this point during argument in the proceedings below.

Based upon the forgoing, we conclude that the two-tier system of registration and voting adopted by defendants constitutes a state service mandate for which no funds have been appropriated. As a result, the local election authorities are relieved of the obligation to implement the mandate, and the trial court correctly ruled that they were excused from complying with the regulations imposed by defendants.

## PLAINTIFFS' CONSTITUTIONAL CLAIMS

We now turn to plaintiffs' constitutional claims.

■ Both the United States Supreme Court and the Illinois Supreme Court have taken a clear stand against the erection of barriers, large or small, to the right to vote. As our supreme court has noted:

> " 'The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.' " *Craig v. Peterson*, 39 Ill. 2d 191, 195, 233 N.E.2d 345 (1968), quoting *Reynolds v. Sims*, 377 U.S. 533, 555, 12 L. Ed. 2d 506, 523, 84 S. Ct. 1362, 1378 (1964).

Most recently, in *Tully v. Edgar*, 171 Ill. 2d 297, 664 N.E.2d 43 (1996), the Illinois Supreme Court stated:

> "Suffrage—the expression by the people of their will—is fundamental to a viable democratic form of government. Article III, section 1, of the 1970 Illinois Constitution reaffirms the principle that all qualified citizens have a constitutionally protected right to vote and to have their votes counted. [Citations.]
>
> *** ' "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." ' [Citations.]" *Tully*, 171 Ill. 2d at 305-06.

In passing NVRA, Congress recognized that overly selective voter registration laws and restrictive administrative procedures that impeded voter registration have historically been used by the various states to improperly disenfranchise citizens from the democratic process. In the legislative history of NVRA, Congress noted:

> "Restrictive registration laws and administrative procedures were introduced in the United States in the late nineteenth and early twentieth centuries to keep certain groups of citizens from voting; in the North, the wave of immigrants pouring into the industrial cities; in the South, blacks and the rural poor. The poll tax, literacy tests, residency requirements, selective purges, elaborate administrative procedures and annual reregistration requirements were some of the techniques developed to discourage participation." H.R. Rep. No. 103—9, at 2 (1993).

In recognition of this history of voter-registration abuses, NVRA was enacted to "reduce these obstacles to voting to an absolute minimum while maintaining the integrity of the electoral process." 42 U.S.C. §§ 1973gg(a), (b) (1994). Of particular significance to the present dispute is the recognition by our supreme court that "[o]ur cases support the view that legislation that affects *any* stage of the election process implicates the right to vote." (Emphasis in original.) *Tully*, 171 Ill. 2d at 307.

The constitution of Illinois specifically guarantees free and equal elections (Ill. Const. 1970, art. III, § 3) and provides that no citizen shall be deprived of equal protection of the laws (Ill. Const. 1970, art. I, § 2). The trial court determined that the two-tier system of voter registration implemented by defendants violates both of these constitutionally protected rights. We agree.

Article III, section 3, of our constitution states that "[a]ll elections shall be free and equal." Ill. Const. 1970, art. III, § 3. The Supreme Court of Illinois has interpreted this section to import the guarantees of the equal protection clause of the federal constitution's fourteenth amendment into Illinois elections. *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 70-71, 566 N.E.2d 1283 (1990). Our examination of the rights conferred by this constitutional provision is not, however, exclusively confined to a fourteenth amendment analysis. The free and equal election clause guarantees the right to vote in Illinois and reflects a broad public policy to expand the opportunity to vote. See *McDunn v. Williams*, 156 Ill. 2d 288, 330, 620 N.E.2d 385 (1993); *Craig*, 39 Ill. 2d at 195; *Anagnost v. Layhe*, 230 Ill. App. 3d 540, 544, 595 N.E.2d 109 (1992). This clause requires that "each voter have the right and opportunity to cast his or her vote without any restraint and that his or her vote have the same influence as the vote of any other voter." *Goree v. Lavelle*, 169 Ill. App. 3d 696, 699, 523 N.E.2d 1078 (1988).

The history of the enactment of the free and equal elections clause by the 1970 Constitutional Convention, as considered by the Committee of Suffrage and Constitutional Amending, specifies that the drafters' goal was to increase the voting franchise:

> "The Committee's proposal is premised on this right to free and equal elections. It specifies certain elemental voting qualifications and disqualifications designed to ensure the responsible exercise of that right. *It calls for the enactment of laws designed to encourage the full and effective participation of all persons meeting these qualifications.*" (Emphasis added.) 7 Record of Proceedings, Sixth Illinois Constitutional Convention 2324-25 (hereinafter cited as Proceedings).

A key motivation of the drafters was to abolish all unnecessary impediments to voting:

> "The Committee proceeded in the belief that broad participation is essential to the proper working of our democracy, that only the most necessary requirements for limiting that participation can be justified, and that the burden of proof for any limitations rests heavily upon those advocating them." 7 Proceedings 2318.

Contrary to defendants' restrictive reading of our state constitu-

tion, the framers intended for the concept of free and equal elections to apply to *all* aspects of the election process, including the registration process:

> "As construed by the Illinois Supreme Court, this concept applies to the entire election process, from a candidate's effort to gain access to the ballot, [citations], to the people's right to nominate candidates, [citations]; to the freedom of the election process from fraud and voter intimidation, [citations], to the counting of every properly cast ballot, [citation]." 7 Proceedings 2324.

■ The free and equal elections clause, according to the committee report, gives constitutional priority to Illinois' public policy of "encourag[ing] the full and effective participation" of the entire electorate. The intent of the drafters of article III, section 3, was clear and unequivocal. Any plan or design whose result might impede, impair or frustrate full participation in the electoral process cannot endure. We conclude that the free and equal elections clause, its history, its language, and its intent prohibit defendants' creation of a confusing system of dual and separate electorates for state and federal elections. Nor will our constitution allow a system that makes it easier to register for some elections than for others. We hold, therefore, that the two-tier system of voter registration implemented by defendants violates the guarantee of free and equal elections in our constitution.

The trial court also found that the defendants' two-tier system of voter registration classified voters into separate federal and state electorates with disparate voting rights and, thus, violated the equal protection clause of our constitution. Ill. Const. 1970, art. I, § 2. Defendants argue on appeal that their actions were constitutionally permissible because they simply did what is required of them to implement NVRA.

The leading case in Illinois that addresses this issue is *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 70-71, 566 N.E.2d 1283 (1990), in which our supreme court held that "[w]hen a statute provides for an inequality in voting power, a question arises as to whether there has been a violation of the constitutional guarantee of equal protection of the law." *Fumarolo*, 142 Ill. 2d at 73. Defendants do not deny that the differentiation between federal and state electorates constitutes a type of "classification," but instead contend that "the guarantee of equal protection is irrelevant when a challenged distinction results from differences in state and federal law under dual sovereignty principles." Defendants cite no authority for this proposition. Instead, this argument is based on their interpretation of *Oregon v. Mitchell*, 400 U.S. 112, 27 L. Ed. 2d 272, 91 S. Ct. 260

(1970), which was, at its core, a case about congressional power rather than equal protection.

The matter before us requires a determination of whether the State's decision to classify state and federal registrants, assigning lesser voting rights to NVRA registrants, violates our guarantee of equal protection. Because this precise issue was not anticipated or addressed by the court in *Mitchell*, that decision is not controlling here.

A classification that provides for inequality of voting power can survive only if it passes the strict scrutiny analysis. Under this standard, the court must conclude that the State employed the least restrictive means available to achieve a compelling state interest. *Tully*, 171 Ill. 2d at 304; *Fumarolo*, 142 Ill. 2d at 73.

Other cases point to the constitutional infirmity of laws placing different conditions on similarly situated electorates within a state. In *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 184-87, 59 L. Ed. 2d 230, 241-43, 99 S. Ct. 983, 990-91 (1979), the court struck down an Illinois ballot access law that requires more petition signatures to appear on local than statewide ballots. It held that without a defensible distinction between the two electorates, the disparity violates equal protection under the federal constitution. See also *Dunn v. Blumstein*, 405 U.S. 330, 345-54, 31 L. Ed. 2d 274, 286-91, 92 S. Ct. 995, 1004-09 (1972) (dual residency requirement of one year in state and three months in locality violates equal protection, even under the asserted rationale that both requirements were essential to preserve ballot integrity after federal law abolished residence requirements for national elections).

In the case *sub judice*, the creation of two separate electorates with disparate voting rights demands application of the strict scrutiny standard. Applying this standard, we must determine whether defendants employed the least restrictive means available to them to achieve compliance with NVRA, which certainly is a compelling state interest. Thus, resolution of this issue compels us to examine whether defendants employed the least restrictive means available in order to comply with NVRA. The trial court determined that defendants had opted for the most restrictive method available in implementing NVRA.

Indeed, the record reflects that defendants waited well over a year before attempting to comply with a federal court order requiring compliance with NVRA. Defendants ultimately opted to implement a two-tier system which they recognized would be "confusing" and characterized by "chaos in the conduct of elections," as reflected in the memorandum from the State Board of Elections, dated December 15, 1994.

Considering the principles and precedents set forth above, and upon careful review of the record, we come to the inescapable conclusion that the two-tier system of registration adopted by defendants constituted the most restrictive means available to comply with NVRA, thereby failing the strict scrutiny standard. Accordingly, we hold that this system cannot stand because it violates the equal protection clause, as well as article III, section 3, of our state constitution.

PROPRIETY OF INJUNCTIVE RELIEF

■ Defendants finally assert that the trial court erred in ordering injunctive relief because it was too broad. This argument is without merit.

It is well established that a trial court is endowed with broad discretion to fashion such remedies or to grant such relief as equity may require to remedy a wrong. *Daniels v. Anderson,* 162 Ill. 2d 47, 65, 642 N.E.2d 128 (1994); *Flynn v. Kucharski,* 49 Ill. 2d 7, 11, 273 N.E.2d 3 (1971). The Illinois Supreme Court has held that our circuit courts may order injunctive relief to prevent an unconstitutional election. See *Coalition for Political Honesty v. Illinois State Board of Elections,* 65 Ill. 2d 453, 461, 359 N.E.2d 138 (1976).

In the instant case, the circuit court determined that future elections would not be free and equal, and would violate equal protection, if NVRA registrants continued to be penalized with less voting power than state registrants. In light of this determination, with which we agree, we find that the relief awarded by the trial court was warranted under the circumstances of this case. The court carefully considered the importance of the rights and issues before it and, in the exercise of its equitable powers, fashioned a remedy that was proper, indeed necessary, to meet the demands of this situation. The grant of injunctive relief, which permitted NVRA registrants to vote in state and local elections, constituted an adequate and appropriate remedy for those constitutional violations. Consequently, we find no abuse of discretion in the scope of relief ordered by the trial court.

For the foregoing reasons, the trial court's order entered May 1, 1996, is affirmed in its entirety.

Affirmed.

McNAMARA and RAKOWSKI, JJ., concur.